**FEDERATED DEPARTMENT STORES, INC., d/b/a Burdines, Plaintiff-Appellee,**

v.

**Norman C. BRINKE, Defendant-Appellant,**

**Florida East Coast Railway Co., etc., Defendant.**

**No. 71-1605**
**Summary Calendar.\***

United States Court of Appeals, Fifth Circuit.

Sept. 20, 1971.

\* [1] Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409.

---

Richard B. Austin, Miami, Fla., for defendant-appellant.

Jerome H. Shevin, Bernard C. Pestcoe, Pozen Pestcoe Gold & Gold, and Shevin & Shevin, Miami, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, INGRAHAM and RONEY, Circuit Judges.

**JOHN R. BROWN, Chief Judge:**

The sole issue in this case is whether the notation "shipper's load and count" (SLC) on a uniform straight bill of lading vitiates Carmack Amendment liability[1] and exculpates the carrier from his negligence in providing an inadequate trailer for transporting a shipment in interstate commerce. Finding that no such result was intended or follows from the SLC provisions of the Bills of Lading Act[2] we affirm the judgment of the District Court, 316 F.Supp. 1402.

Brinke had acted as a freight forwarder for Frigid for some time.[3] Accordingly, sometime in June of 1968, Frigid requested that Brinke supply a trailer for the shipment of electric fans and stands from Frigid's Brooklyn warehouse to Consignee Burdine's[4] Miami, Florida location. Although in the past it had always provided an enclosed van for such shipments, Brinke had no such trailer available on this occasion, and therefore delivered an open or "rag top" van[5] to Frigid's dock. Frigid's traffic manager was apprehensive (if not upset) about the kind of trailer which had been provided, and he therefore telephoned Brinke's terminal manager to protest. The terminal manager assured the traffic manager that the canvas top trailer would be completely adequate and that the fans would arrive in Miami in good condition. To further secure the safe passage of the goods, Terminal Manager promised to place a polyethylene lining under the canvas top after the truck was loaded.

Although this added precaution was timely taken, Traffic Manager's initial anxiety turned out to be well founded and Terminal Manager's confidence in the sufficiency of the rag top van proved unfortunately misplaced. The van arrived in Miami water-logged and its contents were irreparably damaged. Understandably, everybody is looking for some other party on whom to put the loss.[6]

Under the Carmack Amendment, which the parties have stipulated

---

1. 49 U.S.C.A. § 20(11).

2. 49 U.S.C.A. §§ 81–124.

3. Although Brinke had no tariffs on file with the ICC and possesses certification as a freight broker only (not as a freight forwarder) the parties stipulated that Brinke's legal status for purposes of this litigation was that of a freight forwarder since Brinke was performing such services for Frigid. See 49 U.S.C.A. § 1002. Brinke does not contest the holding of the Trial Court to that effect.

4. Federated Department Stores, d/b/a Burdine's.

5. A "rag top" van is covered with a canvas top rather than being permanently enclosed.

6. The shipment was "piggybacked" via Florida East Coast Railway and Southern Railway from Brinke's New Jersey terminal to a rail yard in Hialiah, Florida. There it was picked up by Brinke and delivered to Burdine's. As a result, Burdine's initially tried to have Florida East Coast Railway Company declared jointly and severally liable for the loss, but the railroad was dismissed from the suit on summary judgment, from which action there has been no appeal.

controls the liability in this case, the rule is very simple. The initial and delivering carrier is liable to the holder of a bill of lading, without proof of negligence, for all damage to the goods transported by it, unless it affirmatively shows that the damage was occasioned by the shipper, act of God, the public enemy, public authority or the inherent vice or nature of the commodity.[7] And if goods leave the shipper's hands in good condition and arrive at their destination damaged, it is presumed that the carrier was negligent and responsible.[8]

■ The presumption of liability is, of course, subject to limitation and exception. One of these relied on by Brinke is the shipper's weight, load and count exemption provided by 49 U.S.C.A. § 101.[9]

Brinke's argument is simply this—the bill of lading carried the notation "shipper's load and count," the shipper's loading of the fans onto the now-admittedly inadequate canvas top trailer was improper if not negligent, and therefore, under 49 U.S.C.A. § 101, it is not liable for the damages.

■ This you-should-have-known-better-than-to-rely-on-me argument completely misconstrues both the meaning and the purpose of the SLC section of the Bills of Lading Act. In the first place, Brinke's theory that placing the goods on a trailer so obviously vulnerable to water damage constituted "improper loading" requires a strained, at

best, and we think unreasonable interpretation of that term. It disregards the fact that Frigid's Traffic Manager seriously questioned the propriety of using a rag top van and agreed to do so only upon receiving assurances from Brinke that it was safe and secure. And it disregards the carrier's duty to furnish suitable equipment. The carrier cannot palm off deficiencies in equipment onto the shipper. We cannot say the loading was "improper" under these circumstances. Moreover, even if Frigid was somehow negligent in acquiescing to Brinke's suggestion that the van was safe for shipping the fans—and we doubt that very much—that would have been negligence in *accepting* the trailer, not in the manner of *loading* it, as the term "loading" is contemplated by the statute. Thus, there can be no amelioration of liability on account of the SLC notation because damage did not come from loading—either "proper" or "improper." It came directly from inadequate equipment known specifically to the carrier to be deficient.

■ If anything further was needed to tie down an inescapable carrier liability, it came from the District Court's finding that the damage to the cargo was caused—in part at least—by the presence of holes in the inner plastic lining provided by Brinke, in accordance with their promise to Frigid, *after* the trailer had been moved to Brinke's warehouse in Jersey City. The supplying of a defective polyethylene lining constituted an independent act of negligence on the

7. Secretary of Agriculture v. United States, 1956, 350 U.S. 162, 76 S.Ct. 244, 100 L.Ed. 173; Chesapeake & Ohio Ry. Co. v. Thompson Mfg. Co., 1926, 270 U.S. 416, 46 S.Ct. 318, 70 L.Ed. 659; Adams Express Co. v. Croninger, 1913, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314.

8. Johnson Motor Transport v. United States, Ct.Cl., 1957, 149 F.Supp. 175, 137 Ct.Cl. 892; Southern-Plaza Express v. Harville, 5 Cir., 1956, 233 F.2d 264; Hamilton Mfg. Co. v. Chicago & Northwestern Ry. Co., E.D.Wis., 1959, 176 F. Supp. 546, rev'd on other grounds, 7 Cir., 1960, 277 F.2d 652.

9. "The carrier may also by inserting in the bill of lading the words 'Shippers weight, load and count.' or other words of like purport, indicate the goods were loaded by the shipper and the description of them made by him; and if such statement be true, the carrier shall not be liable for damages caused by the improper loading or by the nonreceipt or by the misdescription of the goods described in the bill of lading * * *."

part of the carrier which contributed to causing damage to the shipment. See Minneapolis, St. Paul & Sault St. Marie Railroad Co. v. Metal-Matic, Inc., 8 Cir., 1963, 323 F.2d 903, 906; United States v. Marshall, 9 Cir., 1956, 230 F.2d 183, 188–193.

■ Of course, the SLC provision has to be applied in light of the well-settled principle of law that a common carrier cannot by agreement relieve itself of liability for its own negligence.[10] The Trial Court found, on evidence amply provided by the record, that Brinke was negligent in (i) providing a canvas top van which was inadequate for the type goods being shipped (and Brinke knew full well the contents and requirements of the shipment) and (ii) in using a defective inner plastic lining to secure the shipment.[11] Even giving full effect to the SLC condition could not exculpate Brinke and relieve it from responsibility for these failures to exercise reasonable care, under the circumstances.[12]

Affirmed.

10. See, e. g., Boston & Maine R.R. v. Piper, 1918, 246 U.S. 439, 38 S.Ct. 354, 62 L.Ed. 820; Cincinnati, N. O. & Texas Pacific R. Co. v. Rankin, 1916, 241 U.S. 319, 326, 36 S.Ct. 555, 557, 60 L.Ed. 1022, 1025; Missouri Pacific R. Co. v. Elmore & Stahl, 1964, 377 U.S. 134, 138, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194, 197.

11. In it brief Brinke asserts that the Trial Court's holding was based upon a theory that Brinke had "waived" the protection of the SLC notation by virtue of Brinke's driver having assisted in the loading of the goods. The brief then enumerates various situations in which the courts have considered and rejected similar fact situations as constituting a waiver.

This argument misses the point of the Trial Court's opinion. The concept of waiver is never mentioned or eluded to. Rather the Court explains the relevance of these facts as follows:

"There is no evidence of any improper loading or misdescription of goods in the Bill of Lading. The evidence simply shows that Brinke, who had previously handled many similar cargoes for Frigid, all in a hard top van, was

*negligent* in providing the canvass top van which was not secure because of the presence of holes in the outer tarpaulin and in the inner plastic lining." (*Emphasis added.*)

Thus the Trial Court perceived the controlling question—as we do—as one of carrier negligence in view of all of the circumstances, not waiver of SLC defenses.

12. This is not to say that placing goods onto an inadequate van could not in a unique situation constitute an improper loading. See, e. g., Standard Hotel Supply Co., Inc. v. Pennsylvania R. Co., S.D.N.Y., 1945, 65 F.Supp. 439, in which a shipper had loaded meats onto an unrefrigerated railroad car without having requested pre-icing from the carrier. The SLC notation on the bill of lading in this case produced a viable defense because at the shipper's actions, the circumstances of the case, was held to constitute an improper loading.

But here it is a simple tender of admittedly inadequate equipment, a protest by the shipper and an unfulfilled promise by the carrier to correct the deficiency.